ELLIS, Judge.
Plaintiff has appealed from a judgment denying him workmen’s compensation for alleged total and permanent disability as a result of an accident on May 2, 1958 during his employment as a manual laborer by the defendant in the construction of The Capitol House in Baton Rouge, Louisiana, in which plaintiff fell three stories to a concrete parapet.
The main question in the District Court as well as on appeal is the extent of plaintiff’s disability. It is the plaintiff’s contention that the defendant has largely failed to overcome the probative value of the “dramatic nature of the accident itself.” In addition, that the spotless work history, the testimony of the lay witnesses, and the sincerity of his complaints of pain as attested to by Dr. Cracraft and Dr. Wyatt and the diagnosis by the latter '(a psychiatrist) of conversion reaction and ridiculitis, which is, generally speaking, an injury to the “sheath” around the “nerve cords” that radiate out of the spine and along the spine, entitled plaintiff to a judgment for permanent and total disability. In contrast, defendant argues that the plaintiff was a fortunate individual “and in some measure should ‘count his blessings’ because seldom, if ever, does a person fall from a third floor building level onto a concrete parapet and live to tell the story — much less sustain no fractures and be so fortunate as to have only superficial bruises and contusions * * * ”. Defendant also calls attention to the fact that by reference to plaintiff’s petition it would show that “as originally asserted, his claim of total and permanent disability was predicated on alleged “pain and weakness in his back and hip” and that such a claim was totally unsupported by the medical testimony.
*577 It is shown that the plaintiff was paid workmen’s compensation at the rate of $35 per week for the period from May 3, 1958 up to and through August 8, 1958, both inclusive, and medical expenses in the amount of $316.36, although defendant in its answer averred that its position before the court was that from and after June 30, 1958, the plaintiff had fully recovered from the effects of any injuries that he may have sustained in the accident of May 2, 1958, and at that time was able to resume his regular work.
As a result of plaintiff’s fall he was rendered unconscious[1] and was immediately taken to Dr. Chas. McVea’s office and then transferred to the Baton Rouge General Hospital where he received further medical attention. Plaintiff was thoroughly examined and found free of any fractures or major internal injuries. He did suffer bruises and contusions and particularly a cut on the right leg which took several weeks to heal as it became infected, however, it has no bearing on plaintiff’s alleged total and permanent disability.
Plaintiff remained in the hospital, until May 7, 1958 when he was released to return to his home. While in the hospital x-rays of the lower back and lumbosacral spine were taken which revealed no evidence of fracture, dislocation or other abnormalities. In fact he was thoroughly examined all over for fractures by x-rays and otherwise and none were found. Dr. McVea saw him again in his office on May 9th, 12th and 15th, and on the latter date was of the opinion that plaintiff was sufficiently recovered to resume his employment, and advised him to return to work. Plaintiff voluntarily returned to Dr. McVea on June 23rd and was again examined and again found able to resume his employment as a manual laborer.
Subsequent to his discharge by Dr. Mc-Vea plaintiff employed his present counsel. He then was seen by Dr. Charles Mosely on May 16th, 19th, 23rd, 27th and 30th, and on June 3rd, 10th, 14th, 24th and 30th, 1958. On the latter date Dr. Mosely discharged plaintiff as physically able to perform the work of a manual laborer.
After plaintiff’s discharge by Dr. Mosely, defendant insurer arranged for him to be examined by Dr. Alvin Stander, orthopedic specialist of Baton Rouge, Louisiana. This examination was made on July 9, 1958 at which time the plaintiff was complaining of pain in his back. This doctor could find no reason for or to substantiate plaintiff’s complaints. Dr. Stander was also of the opinion that plaintiff could return to his former employment at that time.
Counsel for the plaintiff sent him to Dr. Cracraft, an orthopedic surgeon of Baton Rouge, who examined plaintiff on Dec. 1, 1958 at which time he was complaining of pain in his low back and left buttock. It was his opinion as a result of the examination that plaintiff “had a concussion by history, multiple contusions which healed, and that he probably had a low back syndrome due to contusions which healed. I felt that he had made a good recovery and that he could return to work.” This doctor did not think that the plaintiff was a malingerer but thought that plaintiff believed it to be inconceivable that he could have fallen that far without being “all broken up.”
On April 16, 1959, the plaintiff was seen by Dr. Wyatt, a psychiatrist, of Baton Rouge, La., and again on April 30, 1959. Both examinations totalled approximatély forty-five minutes each. Dr. Wyatt found plaintiff cooperative, pleasant, well behaved, above average intelligence and with a good comprehension of ideas. He was still complaining of pain in his lower back and left hip and in the left thigh “some time alternating with numbness.” Dr. Wyatt testified that “The most significant finding in my *578 opinion is that James has developed a partial impotence (this refers to sexual impotence) since the accident.” Dr. Wyatt believes this partial impotence had an emotional basis. Dr. Wyatt explained this impotence as being brought about by plaintiff’s feeling that sex was connected with the function of the back and his back was injured and sex was in some way affected, and “I think that he feels that it is very unlikely for anybody to fall from three stories high in the air and fall on his back without it affecting him in some way, in some important way, as a matter of fact.” Dr. Wyatt, after giving his opinion as a psychiatrist, went into the field of a neurologist although he fairly stated he had not completed his training in it but had had more than the average physician, “but I am not an authority or an expert on neurology.” It was his opinion that the sudden arrest of motion of plaintiff’s fall pulled the bones of the pelvis and spine in a sudden jerking motion so that the roots of the spinal nerves which come off the spinal cord and out of the “holes in the spinal column and the muscles, I think that these roots were pulled and damaged and I think he has a condition known as ridiculitis which is not an unusual condition.” Dr. Wyatt stated that physical examination does not usually reveal the condition because the injury is to the sheath around the nerve and the only way that it could be found would be after a person had been fatally injured and an autopsy done and these changes found. His diagnosis was “really one of symptomo-tology. I think that’s what has happened; I think he will get over it.” While on the subject of ridiculitis Dr. Mosely was of the opposite opinion, viz., that plaintiff was not suffering from this condition. Dr. Wyatt stated that plaintiff’s condition was based upon a physical reaction which he termed a “conversion reaction.”
Other than the testimony of Dr. Wyatt there is no disagreement or conflict in the medical testimony. However, plaintiff introduced the testimony of four lay witnesses to the effect that plaintiff, at the time of the accident was 21 years of age, had been a good, steady, hard worker, that they had not seen him working since the accident other than in the cane field a short while for Glendon Davis. Plaintiff evidently enjoyed a good reputation as a worker and as an individual.
There were motion pictures taken by private investigators without the knowledge of plaintiff during the time that he worked for Glendon Davis in the cane fields which apparently show him doing his job without being affected by any disability. There is testimony, though, that plaintiff had been allowed to rest when he felt like it. Pictures which can be run in ten or fifteen minutes as contrasted to a complete day’s work are not conclusive.
While we are loath as individuals to believe that plaintiff as a result of his fall did not suffer any lasting disability, the preponderance of the evidence upon which the judgment of the court must be based is to the contrary.
It is therefore ordered that the judgment of the District Court be affirmed.

. For how long the record fails to disclose but evidently from the fact that it is not shown the length of the unconscious state must be immaterial in relation to plaintiff’s alleged disability.